IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 2:04-cr-035 |
| | ) |
| CEDANO HOLYFIELD, | ) |
| | ) |
| Defendant. | ) |

## OPINION

On February 18, 2004, a grand jury returned a four-count indictment charging Defendant Cedano Holyfield (Holyfield) with two counts of possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. §922(g)(1) and §924(a)(2), one count of possession with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(A)(iii), and one count of carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §924(c)(1)(A)(i).

Presently before the Court is Defendant's Motion to Suppress, in which Holyfield argues: (1) that officers and detectives of the City of Pittsburgh Police Department lacked probable cause or reasonable suspicion to stop, search, and arrest him at a gas station on July 26, 2003; (2) that Pittsburgh Housing Authority Police lacked probable cause to enter and search his girlfriend's apartment on November 8, 2003; and (3) that his statements to the police immediately after his arrest in both incidents were obtained without the required *Miranda* warnings and were the fruits of an unlawful arrest. Accordingly, Defendant seeks to suppress all statements and evidence obtained as a result of the incidents of July 26, 2003 and November 8, 2003.

This Court heard testimony on Defendant's motion on May 31, 2005, at which the following six witnesses testified: Officers Kevin McCue and James Payne of the Pittsburgh Housing Authority Police; Detective Brock Covington, Sergeant Douglas Epler, and Detective Christopher Wydra of the City of Pittsburgh Police Department; and Marc Caudel, an investigator for the Federal Public Defender's Office for Western Pennsylvania.

I.  **Findings of Fact**

   A.  *The July 26, 2003 Incident*

In the early afternoon of July 26, 2003, Pittsburgh Police Detective Covington was conducting surveillance of Lakeesha Harris in the parking lot of the Sunoco gas station located on 6481 Frankstown Road in Pittsburgh. Detective Covington was well acquainted with Ms. Harris, having personally arrested her at least three times for drug-related crimes. Harris was sitting in the driver's seat of her gold Ford, which was parked by the air pump with the hood up. Detective Covington was parked in an unmarked vehicle in the parking lot, a car length or more away from Harris' car. Detective Covington was supported by a "take-down team," which consisted of Detectives Wydra and Norm Klahre and Sergeant Epler in an unmarked vehicle parked in an alley behind the station, and four officers in two squad cars parked a short distance from the station. Detective Covington was communicating his observations to the take-down

team via two-way radio.[1]

Detective Covington observed Harris for 45 minutes, during which time she remained in her vehicle but made a few calls on her cellular phone. Detective Covington did not observe anyone approach the vehicle and talk to Harris. After 45 minutes, Detective Covington observed a dark blue Honda pull into the Sunoco parking lot. Defendant Holyfield was driving the Honda accompanied by one passenger. Holyfield parked the Honda and walked toward Harris' Ford. Detective Covington observed large bulges in each of Holyfield's pockets. Holyfield then got into the front passenger seat of Harris' vehicle and engaged in a brief conversation which Detective Covington was unable to hear. Holyfield then reached into his pocket with his left hand and pulled out a large plastic shopping bag. Detective Covington described each of these actions to the take-down team in "play-by-play" fashion.

Believing that a drug deal was taking place, Detective Covington radioed the take-down team to proceed to the gas station. Within approximately ten seconds, Sergeant Epler and the detectives arrived at the Sunoco in their unmarked vehicle, accompanied by uniformed police officers in squad cars. Sergeant Epler and Detective Wydra exited their vehicle and approached Harris' vehicle. Sergeant Epler had his gun drawn, and Detective Wydra yelled "Pittsburgh Police!" while displaying his badge on his chest. Upon seeing the take-down team approach,

---

[1] Detective Covington went to the Sunoco supported by the take-down team because they had received an anonymous tip that Lakeesha Harris would be purchasing a large quantity of crack cocaine. The Government conceded at oral argument that the anonymous tip could not serve as sufficient probable cause or reasonable suspicion to search or seize the Defendant. Instead, the Government relies exclusively upon what Detective Covington and his fellow officers witnessed while located in a public place where they had an unquestionable right to be.

Holyfield tossed the plastic shopping bag onto the rear seat of Harris' vehicle.[2] Detective Covington informed the take-down team that Holyfield tossed the bag. Sergeant Epler approached the driver's side of Harris' vehicle and saw a gray plastic "Family Dollar" shopping bag sitting on the rear seat. The bag was partially open and Sergeant Epler could see a smaller baggie containing a small chunk of crack cocaine protruding. After Sergeant Epler informed Detective Wydra that crack cocaine was in the back seat of Harris' vehicle, Detective Wydra ordered Holyfield out of the vehicle, handcuffed him, and conducted a search of his person. A .40 caliber Glock semi-automatic pistol was found in Holyfield's right front pocket. Sergeant Epler recovered the large shopping bag and discovered that it contained four baggies of crack cocaine. The detectives then asked Holyfield if he would consent to the search of his Honda. He refused, saying that there wasn't anything in the car and that the car "did not have anything to do with it." Holyfield later said, "I don't care if y'all search, but y'all have to get consent from Chaz," the passenger in Holyfield's car whose real name is Charles Coleman.

  B.  *The November 8, 2003 Incident*

On November 8, 2003, Pittsburgh Housing Authority Police responded to a domestic violence report at 2062 Bentley Drive, Apartment 756. Upon arriving, the officers could hear a man and woman arguing from inside the apartment. While Officers McCue and Payne knocked loudly on the door, another officer stationed himself at the rear of the apartment to ensure that no

---

[2] Although the Government contends that the officers had not left their vehicle when Holyfield threw the bag onto the back seat, the record is ambiguous on this point. Detective Covington testified, "[t]hey [the officers] were in the parking lot. He saw them coming, then he tossed the bag. I don't know exactly how far they were to their car. But he didn't toss the bag until he saw them coming." (R. 67). Sergeant Epler could not remember how the bag got into the back seat. (R. 75). Detective Wydra testified that when approaching the vehicle on foot he was aware through a radio transmission that a bag had been thrown onto the rear seat, but did not specify exactly when that radio transmission was received. (R. 78).

one could escape through the rear window. After approximately two minutes of knocking, the officer in the rear reported that a man had attempted to escape from the rear window but had turned back into the apartment after spotting the officer. After more knocking, Officers McCue and Payne heard someone approach and unlock the door. They then entered the apartment and observed Defendant Holyfield standing approximately ten feet away at the end of the hallway between the master bedroom and the nursery. The officers observed Holyfield reach across his body with his right hand and pull what appeared to be a handgun from his left side. The officers then drew their weapons and ordered Holyfield to drop the weapon. In response, Holyfield leaned into the nursery and stuffed the weapon under a crib mattress located just inside the door. Holyfield was then ordered to the ground and detained.

The officers then interviewed Holyfield's girlfriend, Alika Carter, who lived in the apartment and had been present when the officers entered. Carter told the officers that she and Holyfield had been arguing when she attempted to leave. According to Carter, Holyfield dragged her back into the apartment, beat her and bit her. The officers observed a bite mark on the left side of Carter's face. Carter then signed a written consent to search the entire apartment, and the officers recovered a loaded Taurus 9 mm semi-automatic pistol from under the crib mattress.

## II.  Discussion

### A.  *The July 26, 2003 Incident*

The Government argues that the detectives had both probable cause and reasonable suspicion to seize Holyfield, and therefore the subsequent search of his person was justified as either a search incident to arrest or an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968).

In support of its argument, the Government relies heavily upon precedents finding probable cause and reasonable suspicion based largely upon bulges in one's clothing or belongings. *See United States v. Palen*, 793 F.2d 853 (7th Cir. 1986); *United States v. Elsoffer*, 671 F.2d 1294 (11th Cir. 1982); *United States v. Roundtree*, 596 F.2d 672 (5th Cir. 1979). In response, the Defendant argues that the detectives had neither probable cause nor reasonable suspicion, as mere bulges in one's pockets, without more, do not establish reasonable suspicion or probable cause. *See United States v. Millan*, 912 F.2d 1014 (8th Cir. 1990); *United States v. Wilson*, 953 F.2d 116 (4th Cir. 1991). The Court need not address the Government's suggestion that Detective Covington had probable cause when he ordered the take-down team to converge on Harris' vehicle since Detective Covington had a reasonable suspicion that a drug transaction was in progress. The subsequent discovery of crack cocaine occurred during the course of a lawful *Terry* stop, and provided probable cause to arrest and search Holyfield.

Law enforcement officers are permitted to detain vehicles and their occupants for a brief time without probable cause, and such stops are governed by the reasonable suspicion standard enunciated in *Terry*. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1968). An officer conducting such a stop "may exercise reasonable superintendence over the car and its passengers." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). This includes ordering the driver and passengers out of the vehicle. *Maryland v. Wilson*, 519 U.S. 408 (1997). Here, Detective Covington observed a woman whom he had arrested three times for drug crimes ostensibly experiencing car trouble, but making no effort to address the situation. Instead, she sat idly in the driver seat for 45 minutes doing nothing except making a few brief calls on her cellular phone. After 45 minutes, Holyfield drove into the gas station, parked, and was observed walking toward

Harris' car with bulging pockets. Rather than approaching Harris on her side of the vehicle or examining the engine, Holyfield went directly into the front passenger seat. He engaged in a brief conversation with Harris and pulled a large shopping bag out of his left pocket. In light of Detective Covington's personal knowledge of Harris' drug-trafficking history, the dubious nature of her car trouble, and Holyfield's conduct, the reasonable observer sitting in Detective Covington's position would conclude that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. Accordingly, Officer Covington was justified in ordering the take-down team to enter the gas station. Furthermore, once Sergeant Epler – who was conducting a lawful *Terry* stop and standing where he had a right to be – observed crack cocaine in plain view protruding from the shopping bag that Holyfield had thrown in the back seat, the officers had probable cause to arrest Holyfield and search him incident to that arrest.

That Holyfield may have thrown the baggie in response to the approach of the officers, one of whom had his gun drawn, does not warrant suppression of the evidence. Even assuming that the officers did not have probable cause to arrest Holyfield, merely drawing a weapon does not convert a *Terry* stop into an arrest. "There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest" so long as their use is "justified by the circumstances." *Baker v. Monroe Twp*, 50 F.3d 1186, 1193 (3d Cir. 1995). Furthermore, the Court of Appeals for the Third Circuit has observed: "[t]he vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn does not constitute arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995). Other courts of appeals have found the showing of weapons justified when the "suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of

7

weapons is commonplace." *United States v. Lechuga*, 925 F.2d 1035, 1040 (7th Cir. 1991); *see also United States v. White*, 648 F.2d 29, 31 (D.C. Cir.1981) (holding police officers' actions in blocking the defendant's car with their cruisers and approaching with guns drawn constituted a reasonable *Terry* stop in response to an anonymous tip concerning drug activity); *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993) (blocking suspect's car with three unmarked cars and approaching with weapons drawn was not an arrest); *United States v. Jackson*, 918 F.2d 236 (1st Cir. 1990) (blocking suspect's vehicle with two police cruisers, approaching with guns drawn, ordering suspects to put their hands on dashboard and subsequently frisking them did not constitute arrest); *United States v. Jones*, 759 F.2d 633, 637 (8th Cir. 1985) (officers' actions in blocking vehicle, approaching with guns drawn and ordering suspect out of car was not an arrest).

Courts have also attached importance to whether an officer's gun is pointed directly at a suspect or whether it is merely drawn and pointed down at his side, as well as the fact that an officer approaching the vehicle may not have a full view of the suspect seated in a vehicle. *See United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988). Here, experienced officers were conducting an investigatory stop for suspicion of drug-trafficking, a criminal activity where the use of weapons is commonplace. *See United States v. Adams*, 759 F.2d 1099 (3d Cir. 1985) (firearms are as much the tools of drug trade as drug paraphernalia); *United States v. Crespo*, 868 F. Supp. 79, 83 (M.D. Pa. 1994) (finding unknown object placed in suspected drug-trafficker's pocket gives rise to reasonable suspicion that suspect is armed). *See also United States v. Barlin*, 686 F.2d 81 (2d Cir. 1982) (officer's actions must be considered in light of violent nature of drug trafficking). Additionally, there is no evidence that Sergeant Epler pointed the weapon at any of

the suspects, as he and Detective Wydra both testified that he merely had the weapon "drawn." Finally, as Sergeant Epler approached the vehicle, he undoubtedly did not have a full view of Holyfield, who was still seated in the front seat of the vehicle. Under these circumstances, Sergeant Epler's decision to draw his weapon as he approached the vehicle was not unreasonable.

Once Sergeant Epler observed the crack cocaine protruding from the shopping bag sitting on the back seat of the vehicle, the plain view exception to the Fourth Amendment's warrant requirement justified his seizure of the bag and arrest of Holyfield. For a seizure to be proper under the plain view doctrine, four factors must be present: (1) the officer must have arrived lawfully at the vantage point from which the object was seen; (2) the object must have been in plain view; (3) the incriminating character of the object must have been immediately apparent; and (4) the officer must have had a lawful right of access to the object seized. *Horton v. California*, 496 U.S. 128, 142 (1990); *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994). As discussed above, Sergeant Epler was conducting a valid *Terry* stop and therefore lawfully arrived at the point where the object was seen. The bag was in plain view, and its incriminating character was readily apparent to an experienced narcotics officer such as Sergeant Epler. Finally, a law enforcement officer may seize contraband from the interior of a car if it may be viewed "from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 740 (1983). Sergeant Epler's seizure of the shopping bag and crack cocaine was therefore valid.

Holyfield also seeks to suppress his response to the detectives' request to search his vehicle. The Government conceded that Holyfield was in custody, but argues, correctly, that

9

Holyfield's contention is contrary to *Rhode Island v. Innis*, 446 U.S. 291 (1980). In *Innis*, the Supreme Court held that "not . . . all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation," but only those statements produced by questioning or actions "that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 299, 301. Here, the officers simply asked whether they could search Holyfield's vehicle. The officers could not reasonably have expected that Holyfield would have responded to this relatively simple question with an incriminating response. Accordingly, Holyfield's motion to suppress his statement will be denied.

    B.    *The November 8, 2003 Incident*

Holyfield asserts that Officers McCue and Payne did not have probable cause either to enter the apartment of Alika Carter or to search her apartment after observing Holyfield place what appeared to be a handgun under the crib mattress. However, the Supreme Court has held that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Additionally, the Government has cited two cases from other courts of appeals holding that a 911 call reporting a domestic emergency, without more, may support a warrantless entry of the home. *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000); *United States v. Cunningham*, 133 F.3d 1070, 1072-73 (8th Cir. 1998). Here, the officers responded to an emergency domestic violence call and heard a man and a woman arguing as well as crying and screaming. They were then informed that a man had attempted to escape from the building out the rear window. These facts, along with the sound of more arguing from inside the apartment, plainly gave the officers probable cause to suspect that a violent

domestic dispute was ongoing and that someone within the apartment was in need of immediate assistance. Thus, their decision to enter the apartment when the door was unlocked and became ajar was reasonable.

So too was their subsequent search of the crib. In addition to observing Holyfield insert what appeared to be a firearm under the mattress, the officers obtained written consent to search the entire apartment from Alika Carter. Holyfield has produced no evidence to suggest that Alika Carter's consent was coerced or otherwise improper. Even assuming that Holyfield had a reasonable expectation of privacy in the apartment, the Supreme Court has squarely held that consent by one who possesses common authority over premises or effects is valid as against the non-consenting person with whom that authority is shared. *United States v. Matlock*, 415 U.S. 164, 170 (1974). A number of courts of appeals have upheld such searches even where, as here, the suspect was at or near the premises during the search and did not give his consent. *United States v. Sumlin*, 567 F.2d 684 (6th Cir. 1977) (defendant refused consent to a search apartment, but female companion gave consent); *United States v. Hendrix*, 595 F.2d 883, 885 (D.C. Cir. 1979) (per curiam) (joint occupant of apartment objected to search, but police obtained consent from the other joint occupant); *Lenz v. Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995) (third party with common authority can consent, "even when a present subject of the search objects"); *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir. 1992) ("[v]alid consent may be given by a defendant or a third party with 'common authority' over the premises. Third party consent remains valid even when the defendant specifically objects to it."); *United States v. Baldwin*, 644 F.2d 381, 383 & n.1 (5th Cir. Unit A 1981) (per curiam) (wife could give consent to automobile search even where the defendant had previously refused consent). The Court of Appeals for the Third Circuit

11

has expressed agreement with the principle enunciated in the foregoing cases. *United States v. Morales*, 861 F.2d 396, 400 n.9 (3d Cir. 1988) (*Baldwin* noted with approval). Accordingly, Alika Carter's consent to search was valid, and Holyfield's motion to suppress the recovered handgun is unpersuasive.

## III. Conclusion

Detective Covington plainly had a reasonable suspicion that Holyfield was engaged in a drug transaction on July 26, 2003. While conducting a valid *Terry* stop, the detectives observed crack cocaine in plain view, justifying the subsequent arrest of Holyfield. Additionally, the November 8, 2003 arrest of Holyfield and search of Alika Carter's apartment was supported both by probable cause and valid consent. Therefore, Holyfield's motion to suppress must be denied.

An appropriate order follows.

_____
Thomas M. Hardiman
United States District Judge

cc: Counsel of record

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) ) ) |
| CEDANO HOLYFIELD, | ) Criminal No. 2: 04-cr-035 |
| Defendant. | ) ) ) ) ) ) |

## ORDER

AND NOW, this 26th day of August, 2005, upon consideration of the Defendant's Motion to Suppress Evidence and Statements (Doc. No. 19), it is hereby ORDERED that the Motion is DENIED; it is further ORDERED that jury selection and trial is scheduled for Wednesday, September 7, 2005, at 9:00 a.m.

*Thos M. Hardiman*
Thomas M. Hardiman
United States District Judge

cc: counsel of record as listed below

Linda E.J. Cohn
Federal Public Defender's Office
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222-3716

Soo C. Song
United States Attorney's Office
700 Grant Street
Suite 400
Pittsburgh, PA 15219